WILLIAM NORMAN AND PHYLLIS JANE MILNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Milner v. Commissioner
Docket No. 13124-88
United States Tax Court
T.C. Memo 1991-464; 1991 Tax Ct. Memo LEXIS 513; 62 T.C.M. (CCH) 791; T.C.M. (RIA) 91464; September 24, 1991, Filed *513 William Norman Milner, pro se. Mary P. Kimmel, for the respondent. DAWSON, Judge. BUCKLEY, Special Trial Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned to Special Trial Judge Helen A. Buckley pursuant to section 7443A(b)(4) and Rule 180 et seq. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE By statutory notice, respondent determined a deficiency in petitioners' 1981 Federal income tax in the amount of $ 23,350.59, together with additions to tax under section 6653(a)(1) and (2) in the amounts of $ 1,167.53 and 50 percent of the interest due on $ 23,350.59, and under section 6659 in the amount of $ 7,005.18. Respondent further determined that petitioners are liable for increased *514 interest under section 6621(c) (formerly 6621(d)). [2]
After a concession by respondent, [3] the issues remaining for decision are whether petitioners are (1) entitled to deduct amounts claimed pursuant to section 616(a) as expenditures paid or incurred for the development of a silver mine, (2) liable for the additions to tax for negligence or intentional disregard of rules and regulations, and (3) liable for increased interest because of a substantial underpayment of tax due to a tax motivated transaction. FINDINGS OF *515 FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated by reference. Petitioners, husband and wife, filed a joint Federal income tax return for 1981 and resided in Plano, Texas, at the time they filed the petition herein. Only petitioner husband appeared at the hearing of this matter and future reference to petitioner in the singular is to William Norman Milner. In December of 1981 petitioner, a data processing consultant by occupation, sought an investment opportunity in precious metals. A former business associate and financial advisor, William Jaco, informed petitioner of a silver mining project promoted and offered by American Precious Metals Reserve, Inc. (hereafter APMR). Mr. Jaco provided petitioner with an APMR promotional brochure explaining the investment arrangement. In this brochure, entitled "The North Reveille Project," APMR professed to have acquired exclusive rights to extract mineral resources from 82 contiguous lode mining claims located on about 1,640 acres in the Reveille Mining District, Nye County, Nevada. APMR's supposed ownership interests in these mining claims were not recorded *516 in the public land records and the record contains no evidence that APMR had such ownership interests. The brochure offered potential investors the opportunity to purchase a quantity of ore-bearing material from the North Reveille Project site at a cost of $ 50 for the first 9,375 tons and $ 25 for each additional 9,375 tons. It further advised that under the purchase terms the investor would pay the cost of developing and mining the ore and would be contractually bound to pay APMR a royalty of 35 percent by weight of any metals extracted; the remaining metal extracted to be the property of the investor. While the brochure suggested that the investor can mine the material on his or her own behalf, that alternative was discouraged as it required the posting of a $ 10,000 bond and rendered unavailable the favorable debt financing of mine development costs available to those who utilized a reputable mine development company. In this regard, Mr. Jaco provided petitioner with an additional brochure extolling the mine development expertise of the Gila Mines Corporation (hereafter Gila Mines). The APMR brochure also included a geologist's letter addressed to APMR concluding that "the *517 North Reveille area does seem worthy of serious consideration." The letter is replete with qualifications and disclaimers regarding its reliability. For example, the geologist states that he spent a mere few hours collecting assays from the area; the assays were based only upon surface sampling (no drilling was performed); the geologist could not, from his limited testing, determine whether the silver contained in the ore deposits was extractable through the less costly leaching process or the more costly flotation milling process; and optimistic silver tonnage calculations for a 6-claim area included so many assumptions they were, as he states, "hardly worth the paper on which they are recorded" and thus "field investigations are needed." While the APMR brochure made mention of existent silver ore deposits in the North Reveille site, it scarcely referred to any profit potential the extraction of silver might offer. On the other hand, throughout its contents the brochure touted the tax advantages of the investment. For example, it stated at the very outset that "The purpose of this brochure is to describe a mining business that may be of interest to certain high-earning, highly *518 taxed individuals" and at another point, the brochure highlighted the potential for attaining a tax deduction equal to six times the amount of cash outlay. Also included in the brochure is a legal research memorandum dated January 1, 1981, prepared by Arnett and Hatten, Attorneys at Law. The memorandum discusses at length the tax laws relevant to the mining industry. On December 31, 1981, less than 2 weeks after learning of APMR, petitioner entered into a Purchase Agreement with APMR to acquire 15,000 tons of unrefined bulk material containing mineral ore. The terms of the agreement were consistent with those recited in the brochure and mentioned above. [4] Simultaneously with execution of the Purchase Agreement, petitioner also entered into a Development Agreement with Gila Mines. Under the terms of the Development Agreement, petitioner agreed to pay Gila Mines the sum of $ 48,000, and in exchange Gila Mines agreed as follows: Consultant [Gila Mines] agrees to develop ore deposits in the North Reveille Project. Consultant further agrees that in the event unpatented property containing commercially marketable quantities of silver ore or other valuable minerals is located in *519 the subject area, Consultant shall expeditiously perform such development services and activities as are required to develop a mine for the purpose of extracting valuable ore from the Client's [petitioner's] deposits and/or from existing claims contiguous to Client's ore deposits. Such activities and services include rendering Consultant's opinions and advice as the most efficient methods of exploiting and mining the ore, the driving of shafts, tunnels and galleries as might be required to make the ore accessible, removal of any overburden, if required, prior to the time production of mined ore commences, and the other expenditures required to accomplish all duties and obligations assumed hereunder. Consultant agrees to prepare for the Client periodic written reports explaining the progress, scope and extent of the development services and activities rendered concerning the development property. Consultant shall identify and prepare for mining 15,000 tons of ore containing silver.
*520 In satisfaction of the contract price, petitioner paid $ 8,000 and gave Gila Mines a 10-year, $ 40,000 promissory note for the balance. By its terms, the note accrues simple interest at an annual rate of 11.25 percent. No payments are required under the note prior to maturity unless minerals are recovered from the mining operation, in which case 15 percent of the value of minerals recovered is to be applied against the balance due on the note, first against interest, then principal. Accrued interest is payable only from the value of minerals recovered. The note purports to give Gila Mines a security interest in petitioner's rights to mining claims in the North Reveille Project. The promissory note, Purchase Agreement, and Development Agreement are each dated December 31, 1981. Petitioner had no previous experience in or special knowledge of the mining industry, and at no time did he visit the North Reveille Project location. He made no investigation of the industry or of APMR or Gila Mines. Petitioner entered into the agreements with APMR and Gila Mines without negotiating or haggling over the terms of the arrangement. In fact, petitioner never met with any representative *521 of APMR or Gila Mines prior to entering into the agreements and did not seek an independent geological study of the North Reveille area. Petitioner did not have a title search performed to insure his interest in the mining claim was acquired free and clear of title defects. Nor did petitioner attempt to price-shop or compare the mine development services offered by alternative mining companies; he passively acquiesced in the use of Gila Mines. Petitioner never inquired into, nor possessed any knowledge of, the precise location of the 15,000 tons of ore-bearing material he purportedly purchased; the material was never specifically identified. Though notified in October 1982, that an independent geological survey had been conducted on the North Reveille mining claims location and that the resultant report was available, petitioner did not obtain a copy. This report made unfavorable mention of the existence of surface metals on the North Reveille Project site. No mine development activity by Gila Mines ever took place on the North Reveille Project site and no marketable quantities of valuable minerals were recovered from the unrefined bulk material purportedly acquired by petitioner *522 from APMR. The record does not disclose that any attempt was ever made by Gila Mines to recover ore or minerals from such material. Within 1-1/2 years of the time petitioner acquired his interest in the North Reveille Project, Gila Mines filed for bankruptcy protection. Petitioner realized no income from the investment. As of the time of trial, he had made no interest or principal payments on the promissory note and was uncertain who, if anyone, held the note. In addition, as of the time of trial, petitioner had taken no action to protect his interest in the ore-bearing material purportedly purchased from APMR and had made no attempts to mine the material. In a letter dated January 25, 1982, addressed to "Customer," APMR advises investors in the North Reveille Project that they are not part of a joint venture and should treat their investments as separate mining businesses. The letter also recommends the maintenance of separate bank accounts and books and records for the mining business, and suggests how the activity might be reported on a Federal income tax return. Attached to the letter is a sample Schedule C completed for a fictitious investor with a $ 30,000 level of investment *523 ($ 5,000 and a $ 25,000 note). The main business activity is reflected as "development" and the product as "silver, gold." No instructions are provided for reporting income from the activity, but a $ 30,000 deduction is shown and labeled as "development expenditures deductible pursuant to Code section 616," and a net loss of $ 30,000 is shown. On their 1981 return, petitioners reported the activity from the APMR investment in a manner consistent with the sample Schedule C. They deducted $ 48,000 (their purported level of investment) as mine development expenditures and reported the same amount as a net loss from the activity. As a result of respondent's examination of petitioners' 1981 tax year, he disallowed the entire amount deducted on Schedule C and determined additions to tax and increased interest as set forth at the outset of this opinion. OPINION We initially address a preliminary matter. For the first time at trial, petitioner raised the argument that the amount deducted on Schedule C, even if determined by the Court to be nondeductible under section 616, should be allowed under section 617 as mining exploration expenditures. Respondent objected to petitioners' raising *524 this argument so late because it created unfair surprise. We reserved our ruling on the issue. As shall be seen, we hold in this case that petitioners' investment was a sham transaction lacking in economic substance; therefore, notwithstanding petitioners' alternative argument, they are not entitled to deduct the claimed mine development expenses. Accordingly, we say no more about section 617. Respondent advances a number of arguments in support of his disallowance of petitioners' claimed mine development expenses. He contends, inter alia, that the mining investment arrangement constitutes a generic tax shelter devoid of economic substance, and that, in any event, petitioners have not shown that the claimed expenses qualify for deduction under section 616. We agree and therefore need not reach respondent's several other alternative arguments. Petitioners maintain that they acquired the silver mining interest with an actual and honest profit objective, that they incurred $ 48,000 of expenditures in 1981 to develop the mining interest, and that they are therefore entitled to the deduction claimed. The burden rests upon petitioners to disprove the correctness of respondent's *525 determination. ; Rule 142(a). Section 616(a) allows a deduction for "all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed." In form, petitioner's investment transaction with APMR and Gila Mines was clearly designed to bring the alleged investment in silver mine development within the purview of section 616(a). We note at the outset, however, the express condition of section 616(a) that allowable deductions are only those "paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed." Petitioner has failed to meet the "commercially marketable" standard required by the section. The geologist's letter included with the APMR brochure completely fails to indicate commercially marketable quantities of ores or minerals. It has long been settled that a taxpayer may structure a financial transaction so as to take advantage of the tax laws and minimize tax liability. ; . It is equally clear, however, that the transaction must be of substantive economic reality and not a mere subterfuge or sham. ; ; ; . The transaction is a sham if it is motivated by tax avoidance rather than by profit objective. , affd. ; , affd. without published opinion sub nom. , affd. sub nom. , affd. without published opinion , affd. sub nom. ; , affd. in part and revd. in part . In , we set forth the following criteria as indicators of tax motivation *527 in a shelter situation: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance.
Also embodied within Rose are the section 183 concepts for determining whether a taxpayer activity was not engaged in for profit. Petitioner's silver mining investment possesses all of these characteristics of tax motivation. The promotional materials, included as a part of the record, clearly focus upon and highlight the tax benefits. Petitioner did not negotiate the price paid under the Purchase Agreement or Development Agreement. The assets in question include the rights to extract valuable metals from ore-bearing material the value of which is inherently difficult to determine in the abstract *528 given that the quantity of existent valuable metal deposits could not have been known with certainty. The amount of petitioner's alleged investment, $ 48,000, represents a substantial overvaluation in relation to the $ 50 cost of the tangible property (the ore-bearing material). [5] The agreement to acquire the tangible property was executed at essentially the same time as the agreement to develop the mining interests. Finally, the bulk of the consideration was deferred by a promissory note. Though the note purports in form to be recourse, we are wholly unpersuaded that the parties intended that it be repaid. Gila Mines agreed to extend $ 40,000 in credit to petitioner without investigating the ability of petitioner to repay the loan. *529 As its only security for the loan, Gila Mines took a security interest in petitioner's mining rights, the value of which was speculative at best. The note requires no repayment of principal until the end of the 10-year term, and interest is payable only from the value of minerals recovered. These circumstances smack of pretense. We find it highly unlikely that a mining company contracting to conduct an expensive mining operation would or could agree to defer for 10 years the receipt of payment of 83 percent of the contract price. Furthermore, we are not persuaded by petitioner's self-serving testimony that he fully anticipates that the holder of the note will take action on the note at maturity. Neither petitioner, nor apparently anyone else, knows of the whereabouts of the original promissory note. In substance the note was nonrecourse. Having determined that petitioner's investment was tax motivated, we now consider the objective factors relevant to determining whether there was economic substance to the transaction. They are: (1) The dealings between the taxpayers and other parties to the transaction, (2) the relationship between amounts paid by the taxpayers to the fair *530 market value of the investment, and (3) the structure of financing used in the transaction. See ; No more than 2 weeks after learning of APMR, petitioner closed a deal to purchase a silver mining interest in the North Reveille Project. On the same day he closed a deal with Gila Mines to develop the mining interest. Prior to that day, petitioner never met with anyone from APMR or Gila Mines to discuss the deal; he dealt only through his financial advisor who was not a person experienced in the mining of natural resources. Petitioner himself was not experienced in the mining industry and made no effort to investigate the potential profitability of the North Reveille Project other than to review the APMR brochures; brochures that focus on the tax saving attributes of the investment and contain nothing demonstrating the existence of commercially marketable quantities of silver deposits. Moreover, petitioner did not competitively bid the mine development services or negotiate the contract price; he passively and nonchalantly accepted the entire arrangement as offered. These facts are not consistent *531 with a profit objective and cast serious doubt on petitioner's interest in the profitability of the investment. In addition, subsequent to execution of the mining Development Agreement, petitioner exhibited little interest in the performance of his investment. He was not provided with the precise location of his mining claim and never expressed any interest in finding out its location. At one point, he was advised of the existence of a report on the North Reveille Project issued by an independent geological surveyor, but never pursued obtaining a copy. On the other hand, we observe that petitioner paid close attention to the instructions issued by APMR on how to report tax deductions from the mining activity and his 1981 Federal income tax return was prepared accordingly. We are wholly convinced, despite petitioner's contention to the contrary, that the purpose of petitioner's investment was to acquire the attendant tax benefits, not to achieve profits. "More weight must be given to the objective facts than to the taxpayer's mere after-the-fact statements of intent." ; . In an *532 apparent effort to prove economic substance by showing that Gila Mines had legitimate mine development operations, petitioner offered the testimony of Mr. Gregory Davis, the president of Gila Mines. Prior to becoming president of Gila Mines, Mr. Davis was a tax accountant by occupation and had no experience in mining silver. It can be inferred from some of the testimony that Gila Mines engaged to some extent in bona fide mining operations, although not at the North Reveille Project site. According to Mr. Davis, Gila Mines ran out of funds before any work could be performed at the site. Mr. Davis' testimony is of little assistance to petitioner. It is obvious from the record that Mr. Davis was instrumental in setting up the APMR/Gila Mines investment arrangement. Though he denies having any ties to APMR, he testified that he was involved as an accountant in attracting investors and raising 3.1 million dollars in cash for the instant and related mining projects. In addition, he had sufficient influence over the silver mining investment scheme to oust the former president of Gila Mines and reinstate himself in the position. He is not a disinterested witness. We are not persuaded *533 that any of the parties ever intended for the North Reveille Project to become an economically viable mining operation. Next we look to the relationship of the amount purportedly invested by petitioner to the fair market value of the investment. Petitioner provided no evidence on the value of his mining interest, but contends his decision to invest was induced by the geologist's letter in the APMR brochure, and by his expectation that the value of silver would rebound from its then recent precipitous drop in price. As we have observed, however, the geologist's letter admits to being totally unreliable and is therefore not indicative of the value of petitioner's investment. Furthermore, petitioner has shown us no evidence that a rise in silver prices was forecasted by those in the know; consequently, such an expectation by petitioner, even if it were bona fide, would not assist us in valuing the investment. The fact that petitioner's investment ultimately proved unprofitable is not determinative of its value at the time he entered into it, but is particularly telling under the circumstances of this case. At trial it was established that no valuable metals were ever extracted *534 from the North Reveille Project and, according to the report of respondent's expert witness, Mr. Charles Miller, a well qualified consulting geologist, no mine development activity ever occurred on the site. An independent geological survey conducted less than 1 year after petitioner invested in the project concluded that it was unprofitable to mine ore in the North Reveille Project. Additionally, Mr. Miller's expert report and testimony disclosed that a title search of the public land records reflected no ownership interest ever having been held by APMR in the 82 contiguous mining claims that ostensibly comprised the North Reveille Project. We are led to the inescapable conclusion that the value of petitioner's mining claim interest, if indeed he acquired any, was insignificant in relationship to the amount allegedly invested. In fact, it appears that petitioner bought 15,000 tons of dirt, from someone who had no apparent ownership interest in it, on an unsupported allegation that it contained silver ore. We look lastly at the structure of the financing used in the transaction. Petitioner financed 83 percent of the claimed mine development expenditures through a promissory note *535 given to Gila Mines. By the note's terms, interest is payable only from mineral proceeds, and payment is secured only by the petitioner's ownership rights to extract minerals. Petitioner conducted himself with total disinterest with respect to the availability of mineral deposits. Therefore, in effect, the promissory note provisions regarding interest payments and security for payment were spurious. We held above that in substance the note is nonrecourse. Under the totality of these circumstances, repayment of the note is essentially deferred indefinitely and the instrument is therefore illusory. The terms of the note are such that they could not have been obtained at arm's length. We conclude that the structure of the financing in this case is further indication that petitioner's entire investment transaction lacked economic substance. We hold overall that petitioners' silver mining investment is a sham transaction lacking in economic substance. It is to be disregarded for Federal income tax purposes. Therefore, petitioners are not entitled to deduct the mine development expenditures claimed for 1981. Because of this holding we need not address the parties' several alternative *536 arguments. Respondent determined additions to tax for negligence under section 6653(a)(1) and (2). If any portion of the tax deficiency is due to negligence, the addition to tax under section 6653(a)(1) is imposed on the entire deficiency, whereas the addition to tax under section 6653(a)(2) is imposed on the portion of the tax deficiency attributable to negligence. Negligence in this context has been defined as the lack of due care or the failure to do what a reasonable and ordinary prudent person would do under the circumstances. . Petitioners bear the burden of proving that imposition of the additions to tax is erroneous. . Under the circumstances, petitioner demonstrated imprudence and lack of due care. He was motivated to acquire the silver mining interest by its tax avoidance features. Petitioner approached the transaction in an unbusinesslike manner, failing to make appropriate business inquiries and investigations prior to investing. He therefore acted unreasonably in deducting the amount invested, since the transaction, regardless of its form, clearly constituted *537 a subterfuge for the purpose of avoiding tax. Petitioners were negligent and the entire tax deficiency is attributable to negligence. They have adduced no evidence to the contrary. We sustain the section 6653(a)(1) and (2) additions to tax. Respondent also determined that interest on the underpayment of tax for 1981 is to be calculated in accordance with section 6621(c) (formerly 6621(d)) as in effect for returns due prior to January 1, 1990. That subsection provides that the rate of interest on a substantial underpayment attributable to tax motivated transactions is 120 percent of the statutory interest rate established in accordance with section 6621(a). By "substantial," the Code refers to an underpayment that is greater than $ 1,000. Sec. 6621(c)(2). Included in the definition of tax motivated transaction is "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). A transaction devoid of economic substance is a sham or fraudulent transaction. ; . In dealing with the merits of this case we have decided that petitioner invested in the APMR silver mining program for the *538 purpose of attaining the attendant tax benefits and have concluded that the transaction lacked economic substance. The transaction was a sham and therefore tax motivated. The underpayment of tax is substantial in that it is greater than $ 1,000. We sustain respondent's determination of increased interest pursuant to section 6621(c). To reflect a concession by respondent, An appropriate order will be issued. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the year in issue; all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In the same notice of deficiency respondent also made determinations regarding petitioners' 1982 taxable year. The two years involve separate issues. In this Opinion we decide only the issues pertaining to the 1981 taxable year.↩
3. Respondent concedes that petitioners are not liable for the addition to tax imposed by section 6659.↩
4. Petitioner paid APMR a total of $ 50, which appears to be $ 25 less than that called for by the terms of the Purchase Agreement. There is no explanation for this discrepancy in the record and we treat the purchase price as having been $ 50.↩
5. The purchase agreement also included petitioner's promise to pay over 35 percent of the minerals extracted from the ore-bearing material; however, this promise proved illusory since no minerals were ever recovered. Only $ 50 was tendered in consideration of the purchase price.↩